RECEIVED
NOV 3 0 2009
TONY R. MOORE, CLERK
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE, LOUISIANA

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE DIVISION

| | |
|---|---|
| MERRILL LYNCH, PIERCE, FENNER & SMITH INC. | CIVIL ACTION NO. 08-0819 |
| VERSUS | JUDGE DOHERTY |
| SUCCESSION OF MARY L. SCOTT, ET AL. | MAGISTRATE JUDGE METHVIN |

## MEMORANDUM RULING

Pending before the Court are two motions for summary judgment filed in this interpleader action, as follows: (1) Motion for Summary Judgment filed by defendant Brenda B. Orgeron [Doc. 19]; and (2) Motion for Summary Judgment filed by defendant Edward Crumley as the Executor for the Estate of Buck J. Scott [Doc. 20]. In her motion, Ms. Orgeron moves for summary judgment on grounds "[t]here is no genuine issue of material fact concerning the right of mover, as duly qualified executrix of the Succession of Mary Scott, to possess and administer the securities which are the subject of this interpleader action." Mr. Crumley opposes Ms. Bergeron's motion [Doc. 23], and in his motion for summary judgment, seeks (1) a "finding that Arkansas law, not Louisiana law, should be applied to determine the ownership of the Merrill Lynch brokerage account at issue in this action, and (2) awarding ownership of the account to the Estate of Mr. Scott." Ms. Orgeron opposes Mr. Crumley's motion [Doc. 24]. Additionally, the plaintiff in this action, Merrill Lynch, Pierce, Fenner & Smith, Inc. ("Merrill Lynch") filed an opposition brief for the limited purpose of requesting that any judgment rendered in this matter include an award to Merrill Lynch for its costs and attorney's fees incurred in filing and prosecuting the case.

After consideration of the arguments of the parties and the applicable law, this Court

concludes Louisiana law does not apply to determine the ownership of the Merrill Lynch account at issue. However, because neither party has briefed the issue of which state's law beyond Louisiana's, applies to the nature of the asset itself (i.e., the account), this Court cannot determine what state law applies to determine the ownership of the account. Additionally, this Court determines, if, as Mr. Crumley argues, Arkansas law applies to the account, there are genuine issues of material fact with respect to the intent of the owners of the account such that summary judgment is precluded at this juncture. Therefore, both motions for summary judgment are DENIED at this time.

I.  **Factual and Procedural Background**

   A.  **Undisputed Facts**

The following facts are undisputed by the parties:

1. Mary L. Scott and Buck J. Scott were married in 1991.

2. Mary Scott had previously been married to James Howard Blake, and was widowed by his death in 1989.

3. A daughter, Brenda Blake Orgeron, was born to the union of Mary Scott and James Howard Blake prior to Mr. Blake's death.

4. Mary Scott was an employee of Walmart Stores for approximately 17 years before her retirement, and Mary Scott acquired a significant number of shares in that company during the course of her employment.

5. Before they married, on or around May 15, 1991, Mary Scott and Buck Scott executed an agreement[1] providing that the property each of them brought into the marriage remained the separate property of that spouse throughout the marriage.

6. Mary Scott and Buck Scott lived in Arkansas immediately following their marriage in 1991 until the beginning of 2008. In January 2008, approximately three months before she died, Mary Scott was diagnosed with colon cancer. Around that time, she

---

[1] Although Ms. Orgeron refers to the agreement executed by Mary Scott and Buck Scott as a "prenuptial agreement," in its complaint in interpleader, Merill Lynch refers to the agreement as an "antenuptial agreement."

traveled to Patterson, Louisiana, where her daughter Brenda Orgeron lived.[2]

7. On March 5, 2008, ten days before she died, Mary Scott executed a "Declaration of Domicile," declaring:

> "Appearer currently and habitually resides in St. Mary Parish, Louisiana, where she has her principal establishment. Appearer wishes to declare said parish as her docile in accordance with Article 42 of the Civil Code of Louisiana, as she has a present intent to reside there and no present intention of leaving to reside anywhere else."

8. Mary Scott executed a will in Louisiana prior to her death. The will was executed in valid Louisiana form before a Louisiana notary. In that will, Mary Scott created an educational trust for her four great-grandchildren and left the residue of her property to Brenda Orgeron and her two children, who are the parents of the beneficiaries of the educational trust. The will makes no mention of the Merrill lynch account at issue in this litigation.

9. Mary Scott died in Louisiana on March 15, 2008.

10. Buck Scott died in Arkansas on July 14, 2008.

11. Buck Scott was domiciled in Arkansas until his death.

10. Prior to their deaths, on or about October 17, 2000, Mary Scott and Buck Scott opened an account at Merrill Lynch in Arkansas – Account No. 563-20W84 ("the Account") – and transferred into that account securities from a prior Merrill Lynch account held jointly by Mary and Buck Scott.[3]

---

[2] Although all parties agree Mary Scott traveled to Louisiana in early 2008, the parties do not agree as to her intentions regarding her residency when she first traveled there. Although Ms. Orgeron contends her mother immediately "moved" to Arkansas upon being diagnosed with colon cancer in January 2008, Mr. Crumley contends Buck Scott believed Mary would return to Arkansas to undergo chemotherapy treatment, and that the travel to Patterson, Louisiana was merely a "visit" to see family. Mr. Crumely contends Buck Scott told him Mary Scott never informed Buck of any intention to move to Louisiana on a permanent basis prior to her death. *See* Affidavit of Edward Crumley, ¶1.

[3] Although Merrill Lynch's complaint states the prior account from which funds were transferred was maintained "in Mrs. Scott's name alone," documents provided by Merrill Lynch demonstrate otherwise. The documents provided by Merrill Lynch show the prior account – Account No. 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 – lists both "Mary L. Scott" and "Buck J. Scott" as "JTWROS" – *i.e.*, "Joint Tenants with Rights of Survivorship" – on the documents. Therefore, it appears both Mary Scott and Buck Scott co-owned the securities invested in the prior account. Merrill Lynch has been unable to provide documents executed by Mary Scott and Buck Scott naming themselves as joint

11. In order to open the Account, Mary Scott and Buck Scott executed a document entitled "Merrill Lynch Client Relationship Agreement." On that document, Mary and Buck Scott checked the names of both "Client 1" (Mary Scott) and "Client 2" (Buck Scott) as account owners. In the next box, titled "Joint Account Only," Mary and Buck Scott checked the box labeled "JTWROS." This designation stands for "Joint Tenants With Rights of Survivorship."

12. The Merrill Lynch Client Relationship Agreement was executed by Mary Scott and Buck Scott in Arkansas.

13. The broker of record identified on Merrill Lynch Account No. 563-20W84 is based in Little Rock, Arkansas.

14. All account statements for Merrill Lynch Account No. 563-20W84 were mailed to the residence of Mary and Buck Scott in Mena, Arkansas.

**B.   Disputed Facts**

The following facts are disputed by the parties:

Brenda Orgeron contends the reason Buck Scott's name appears on Merrill Lynch Account No. 563-20W84 is that Merrill Lynch representatives were urging Mary Scott to remove the name of her deceased husband, James Blake, from the account, and at the time Mary Scott did that, Buck Scott "was with her," and Mary Scott had access to Buck Scott's social security number, but did not have Ms. Orgeron's social security number. For this reason alone, Ms. Orgeron contends Mary Scott added Buck Scott's name to the Merrill Lynch account. Additionally, Ms. Orgeron contends Mary Scott "was under the impression that there was some tax advantage to having more than one name on the account, based upon information given to her by a tax advisor." Ms. Orgeron contends the foregoing was explained to her by both Mary Scott and Buck Scott during one of their visits to Patterson, Louisiana before they died. Ms. Orgeron contends at that time, "Mary Scott declared, and Buck agreed, that the addition of [Buck's] name did not change in any respect their prenuptial

---

tenants with rights of survivorship vis-a-vis the prior account.

agreement that the stock remained hers and that she wanted it to go to Brenda and her children upon Mary's death." The foregoing attestation is contained in Ms. Orgeron's Affidavit, attached to her motion for summary judgment.

Additionally, in late 2007, Ms. Orgeron contends in a conversation with her long-time friend, Inola Fairless, Mary Scott indicated she needed to get her will "fixed up," to be sure that the Walmart stock was going to Brenda and her children and grandchildren. According to Ms. Fairless, Mary Scott told Ms. Fairless the only reason Buck Scott's name was on the Merrill Lynch account was because the "tax people" said it was better if she had a second name on the account.

Finally, Ms. Orgeron contends in February 2008, shortly before her death, Mary Scott was visited in Patterson, Louisiana by Leon Blake, the younger brother of her first husband, and his wife, Barbara Blake. According to Ms. Orgeron, Mary Scott asked Mr. Blake to act on her behalf in gathering assets remaining in Arkansas, including the Merrill Lynch account, and in fact, executed a power of attorney in his favor in order that he could do so. According to Ms. Orgeron, Mary Scott made it clear to the Blakes that she intended for the Walmart stock in the Merrill Lynch account to pass under her will to her descendants. Accordingly, in his Affidavit, Mr. Blake attests he traveled to Mena, Arkansas and met with Buck Scott and Buck's daughter, Barbara, and Barbara's husband, Edward Crumley. According to Mr. Blake, at that time, Buck Scott declared he and Mary had agreed that whatever property each of them brought into the marriage would remain that spouse's separate property, and that nothing had changed that agreement. Additionally, according to Mr. Blake, Buck Scott and his daughter and son-in-law confirmed they knew that Mary's wishes were for this stock to pass under her will to her descendants, and that they intended to carry out those wishes.

The foregoing scenario is wholly disputed by Edward Crumley. In Mr. Crumley's Affidavit, he states Buck Scott made no such acknowledgment with regard to the Merrill Lynch account and actually refused to have his name removed as a joint owner of the Merrill Lynch account. Mr. Crumley states he, too, did not "acknowledge" or "agree" that Buck Scott would renounce any or all of his rights as a joint owner of the Merrill Lynch account. Additionally, Mr. Crumley points out that Ms. Orgeron's motion for summary judgment discusses only Walmart stock owned by Mrs. Scott prior to her marriage, but that Ms. Orgeron has failed to prove all cash and securities currently maintained in the Merrill Lynch account is Walmart stock owned solely by Mary Scott. Accordingly, Mr. Crumely contends even if this Court is persuaded by Ms. Orgeron's argument that Mary Scott's estate is entitled to the stock she held prior to her marriage to Buck Scott, it would be improper for the Court to award all funds currently held in the Merrill Lynch account to Ms. Orgeron without first requiring a proper accounting of the funds.

On June 10, 2008, Merrill Lynch filed the instant lawsuit interpleader action pursuant to 28 U.S.C. §1335,[4] contending "a controversy exists as to whether the securities held in the Account are

---

[4] Section 1335 states:

> (a) The district courts shall have original jurisdiction of any civil action of interpleader or in the nature of interpleader filed by any person, firm, or corporation, association, or society having in his or its custody or possession money or property of the value of $500 or more, or having issued a note, bond, certificate, policy of insurance, or other instrument of value or amount of $500 or more, or providing for the delivery or payment or the loan of money or property of such amount or value, or being under any obligation written or unwritten to the amount of $500 or more, if
>
> > (1) Two or more adverse claimants, of diverse citizenship as defined in subsection (a) or (d) of section 1332 of this title, are claiming or may claim to be entitled to such money or property, or to any one or more of the benefits arising by virtue of any note, bond, certificate, policy or other instrument, or arising by virtue of any such obligation; and if (2) the plaintiff has deposited such money or property or has paid the amount

deliverable to the survivor of the two parties on the account agreement, Mr. [Buck] Scott, or deliverable to Mrs. Scott's heirs as they would have been prior to her marriage to Mr. Scott."[5] As a result, Merrill Lynch contends it cannot determine the respective interests of the known potential claimants in the securities held in the account. Merrill Lynch lists the potential claimants as (1) the Succession of Mary Scott, a Louisiana juridical entity, acting through its authorized representative Brenda Blake Orgeron; (2) Buck Scott, a citizen and resident of the State of Arkansas, and (3) Brenda Blake Orgeron, a citizen and resident of the state of Louisiana. As Buck Scott died after the filing of this interpleader action, Edward G. Crumley as the Executor of the Estate of Buck J. Scott, was substituted as a party claimant in this matter.[6]

## II.  Law and Analysis

### A.  Summary Judgment Standard

"A party against whom a claim, counterclaim, or cross-claim is asserted or a declaratory judgment is sought may, at any time, move with or without supporting affidavits for a summary judgment in the party's favor as to all or any part thereof." FED. R. CIV. PROC. 56(b). Summary

---

of or the loan or other value of such instrument or the amount due under such obligation into the registry of the court, there to abide the judgment of the court, or has given bond payable to the clerk of the court in such amount and with such surety as the court or judge may deem proper, conditioned upon the compliance by the plaintiff with the future order or judgment of the court with respect to the subject matter of the controversy.

(b) Such an action may be entertained although the titles or claims of the conflicting claimants do not have a common origin, or are not identical, but are adverse to and independent of one another.

28 U.S.C. §1335.

[5] *See* Complaint of Merrill Lynch, Doc. 1, at ¶ 14.

[6] *See* Order granting Motion to Substitute, Doc. 13.

judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. PROC. 56(c).

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

FED. R. CIV. PROC. 56(e).

As summarized by the Fifth Circuit in *Lindsey v. Sears Roebuck and Co.*, 16 F.3d 616, 618 (5th Cir. 1994):

> When seeking summary judgment, the movant bears the initial responsibility of demonstrating the absence of an issue of material fact with respect to those issues on which the movant bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). However, where the non-movant bears the burden of proof at trial, the movant may merely point to an absence of evidence, thus shifting to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial. Id. at 322; *see also, Moody v. Jefferson Parish School Board*, 2 F.3d 604, 606 (5th Cir.1993); *Duplantis v. Shell Offshore, Inc.*, 948 F.2d 187, 190 (5th Cir.1991). Only when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party" is a full trial on the merits warranted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).
>
> The Supreme Court has instructed:
>
> The plain language of Rule 56(c) <u>mandates</u> the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Where no such showing is made, "[t]he moving party is 'entitled to a judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof."
>
> . . . .

> . . . In ruling upon a Rule 56 motion, "a District Court must resolve any factual issues of controversy in favor of the non-moving party" only in the sense that, where the facts specifically averred by that party contradict facts specifically averred by the movant, the motion must be denied. That is a world apart from "assuming" that general averments embrace the "specific facts" needed to sustain the complaint. As set forth above, Rule 56(e) provides that judgment "shall be entered" against the nonmoving party unless affidavits or other evidence "set forth specific facts showing that there is a genuine issue for trial." The object of this provision is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit. Rather, the purpose of Rule 56 is to enable a party who believes there is no genuine dispute as to a specific fact essential to the other side's case to demand at least one sworn averment of that fact before the lengthy process of litigation continues.

*Lujan v. National Wildlife Federation*, 497 U.S. 871, 884, 888-89 (1990)(quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).

The Fifth Circuit has further elaborated:

> [The parties'] burden is not satisfied with 'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' by 'unsubstantiated assertions,' or by only a 'scintilla' of evidence. We resolve factual controversies in favor of the nonmoving party, but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts. We do not, however, in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts. ...[S]ummary judgment is appropriate in *any* case where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant.

*Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (*en banc*)(citations and internal quotations omitted).

Finally, in evaluating evidence to determine whether a factual dispute exists, "credibility determinations are not part of the summary judgment analysis." Id. To the contrary, "in reviewing all the evidence, the court must disregard all evidence favorable to the moving party that the jury is not required to believe, and should give credence to the evidence favoring the nonmoving party, as

well as that evidence supporting the moving party that is uncontradicted and unimpeached." *Roberts v. Cardinal Servs.*, 266 F.3d 368, 373 (5th Cir. 2001).

### B.     What law governs the Merrill Lynch account?

Ms. Orgeron contends Louisiana law applies to determine the owner of the Merrill Lynch account at issue, while Mr. Crumley contends Arkansas law applies. Mr. Crumley contends the decision as to which law applies will likely determine which party owns the account, as Arkansas law likely will lead to the conclusion that the Estate of Buck Scott is the owner of the account, and an application of Louisiana law will lead to the conclusion that Ms. Orgeron is the owner of the account. Ms. Orgeron does not agree, arguing even if Arkansas law applies, she is still the owner of the account under Arkansas law.

In support of her argument that Louisiana law applies, Ms. Orgeron contends "it is axiomatic that the law of the decedent's domicile governs the disposition of movable property belonging to the decedent," citing Article 3532 of the Louisiana Civil Code, which states:

> Except as otherwise provided in this Title, testate and intestate succession to movables is governed by the law of the state in which the deceased was domiciled at the time of death.

La. Civ. Code art. 3532 (West 2009).[7]

---

[7] Although neither party has identified it as such, corporate stock is an incorporeal movable. *See, e.g., In re Hill*, 981 F.2d 1474, 1487 (5th Cir. 1993).

Mr. Crumley contends under Louisiana law, the issue is governed by former Article 1536 of the Louisiana Civil Code (applicable at the time of the instant dispute), which provided that a donation inter vivos of an incorporeal thing, such as a credit, right, or action was not valid unless made by authentic act passed before a notary public and two witnesses. Mr. Crumley argues a deposit account is an incorporeal right, and Louisiana courts have generally held the creation of an account in the name of two or more joint account owners creates no ownership interest in the surviving owner in the absence of such an authentic act. Because the Client Agreement in this case was not notarized and witnessed, Mr. Crumley acknowledges the Agreement would not meet the requirements of an authentic act under Louisiana law.

Because this Court concludes Louisiana law does not apply to determine the ownership of the Merrill Lynch

Based on the foregoing codal article, Ms. Orgeron contends "it is clear that Louisiana law applies to the issue of devolution of the stock which is at issue in this case." Ms. Orgeron further contends even if Arkansas law applies, it also recognizes the situs of personal (movable) property is the domicile of its *owner* and distribution of such property is governed by the law of the domicile of the deceased *owner*. See *Simmons v. Simmons*, 158 S.W.2d 42 (1942).

Ms. Orgeron's argument fails to consider a very important concept, however. Under Louisiana law, Article 3532 states "testate and intestate *succession* to movables is governed by the law of the state in which the deceased was domiciled at the time of death." However, the asset which purports to be subject to a succession – it's nature and by whom it is owned – is a separate inquiry from how it will be treated within the succession – *once in the succession*. The Merrill Lynch account was opened and administered in Arkansas, to two owners of the account who lived in Arkansas, and who received their account statement in Arkansas for a period of almost 18 years. Arkansas law recognizes joint tenancy agreements which allow ownership to transfer *without passing through a succession or probate*. Section 23-32-207 of the Arkansas Code states:

> **§23-32-207.   Accounts and certificates of deposit in two or more names**
>
> ***Checking accounts and savings accounts may be opened and certificates of deposit may be issued by any federally or state-chartered savings and loan association***, in the names of two (2) or more persons, either minor or adult, or a combination of minor and adult. Checking accounts, savings accounts, and certificates of deposit shall be held and payable as follows:
>
> [ . . . ]
>
> (2)(A)   If the person opening the account or purchasing the certificate of deposit designates in writing to the federally or state-chartered savings and loan association that the account or the certificate of deposit is ***to be held in joint tenancy or in joint tenancy***

---

account, this Court need not determine which party in this matter properly analyzed the issue under Louisiana law.

> *with right of survivorship*, or that the account or certificate of deposit shall be payable to the survivor or survivors of the persons named in the account or certificate of deposit, then the account or certificate of deposit and all additions thereto **shall be the property of those persons as joint tenants with right of survivorship.**
>
> (B)  The account or certificate of deposit may be paid to or on the order of any one (1) of those persons during their lifetime unless a contrary written designation is given to the federally or state-chartered savings and loan association, or to or on the order of any one (1) of the survivors of them after the death of any one (1) or more of them.
>
> (C)  *The opening of the account or the purchase of the certificate of deposit in this form shall be conclusive evidence in any action or proceeding to which either the federally or state-chartered savings and loan association or the surviving party is a party of the intention of all of the parties to the account or certificate of deposit to vest title to the account or certificate of deposit, and the additions thereto, in such survivor.*

Arkansas Code Ann. §23-32-207 (West 2009) (emphasis added).[8]

An important characteristic of joint tenancy is that:

> . . . *it is not testamentary* but 'is a present estate in which both joint tenants are seized in the case of real estate, and possession in case of personal property, per my et per tout,' that is, such joint tenant is seized by the half as well as by the whole. *The right of survivorship in a joint tenancy therefore does not pass anything from the deceased to the surviving joint tenant. Inasmuch as both cotenants in a joint tenancy are possessors and owners per tout, i.e., of the whole, the title of the first joint tenant who dies merely terminates and the survivor continues to possess and own the whole of the estate as before.*
>
> *Consistent with the foregoing, the rule appears well settled that a devise by a joint tenant, who is survived by other joint tenants, is not effective to pass any title to the real estate in joint tenancy for the reason that the title passes by operation of law to the survivor or survivors.* See *In re Estate of Alpert*, 95 Ill.2d 377, 69 Ill.Dec. 361, 447 N.E.2d 796 (1983); *First United Presbyterian Church v. Christenson*, 33 Ill.App.3d 928, 339 N.E.2d 15 (1975); *see also* 4A R. Powell, *Real Property* ¶ 619.1 (1982); 20 Am.Jur.2d *Cotenancy and Joint Ownership* § 3 (1965). Such a rule applies in full measure to personal property. *See Miller*, 243 Ark. 251, 419 S.W.2d

---

[8] Ms. Orgeron cites Arkansas Code Section 23-32-1005 as the applicable article under Arkansas law. However, this Court's own research shows Section 23-32-1005 was repealed by Act 89, §3, effective May 31, 1997. Therefore, the proper section under the Arkansas Code appears to be Section 23-32-207, as cited by Mr. Crumley. The substance of the two sections appears to be the same.

> 599. ***In sum, title to property held in joint tenancy takes precedence over the claim of a devisee, legatee or heir, as the case may be***. *In re Estate of Alpert*, 95 Ill.2d at 381, 69 Ill.Dec. at 363, 447 N.E.2d at 798.

*Gladson v. Gladson*, 800 S.W.2d 709, 710 (Ark. 1990) (emphasis added).

Therefore, although Mary Scott executed both a Declaration of Domicile and a properly recorded will in Louisiana several days before her death, that Declaration and will can only address property which she, upon death, owned and thus, could pass into her succession and thus, be governed by Louisiana law. By virtue of neither the Declaration of Domicile nor the will could Mary's "interest" in the Merrill Lynch account become part of her succession such that it could be passed to her descendants. **Rather, at the moment of her death, Mary Scott, being the first joint tenant who died, merely terminated as an owner of the account, and the survivor – in this case, Buck Scott – continued to possess and own the whole of the account as before.**

Thus, this Court concludes Louisiana law does not apply to determine the ownership of the Merrill Lynch account. Upon her death, Mary Scott's interest in the Merrill Lynch account terminated. Thus, Mary Scott had no interest in the Merrill Lynch account to pass into the succession of Mary Scott, such that Louisiana law would govern the devolution of that property to Mary's heirs.

This Court presumes Arkansas law applies to the account, as the account was opened in Arkansas; the joint tenants of the account lived in Arkansas and received their account statement in Arkansas for a period of almost 18 years; and the broker who opened the account and serviced the account did so in Arkansas. However, no party to this litigation has addressed what state's law applies to the contract or the nature of this asset (that is, the actual account itself) apart from the issue

of who owns the stock today.[9]

Moreover, this Court concludes that, even if Arkansas law were to apply to the account, it appears summary judgment would be inappropriate at this juncture of the litigation, as the Arkansas Supreme Court has made clear that §23-32-1005 of the Arkansas Code – the precursor to current Section §23-32-207 – purports to regulate only banking institutions and federally and state chartered savings and loan associations, none of which accurately characterize Merrill Lynch, characterized by the parties as a "broker-dealer." Under the language of former Section 23-32-1005 (which essentially mirrors the language found in the current statute), the opening of the account in this case by Mary and Buck Scott as joint tenants with right of survivorship therefoer is *not* deemed conclusive evidence of intent. *See Hall v. Superior Federal Bank*, 794 S.W.2d 611 (Ark. 1990) ("With respect to the Merrill Lynch account, §23-32-1005 purports to regulate only banking institutions and federally and state chartered savings and loan associations. Hence, under the wording of the statute the opening of the Merrill Lynch account by Mrs. Hall and Mrs. Edwards as joint tenants with rights of survivorship ***is not deemed conclusive evidence of intent*** and the trial court did not err by admitting evidence of Dorothy Edwards's intent in placing Mrs. Virginia Hall's name on the Merrill Lynch account.") (emphasis added).

---

[9] Attached to Mr. Crumley's motion for summary judgment are certain materials, presumably provided by Merrill Lynch to Mary and Buck Scott, which provide instructions for executing the "Client Relationship Agreement," which is the form used by Merrill Lynch to open an account such as the one at issue. This document is very difficult to read, because of the small nature of the font used. However, as best this Court can determine, in those materials, there is a section entitled "Governing Law," which states:

> "Unless otherwise specified, my agreements with you will be governed by and interpreted under the laws of the **state of New York**."

*See* Exhibit "E" to Mr. Crumley's Motion for Summary Judgment [Doc. 20] (emphasis added).

Notwithstanding the foregoing, the parties to this litigation argue *only* that *Arkansas* or *Louisiana* law applies to the nature of the asset, i.e. the account. This Court has already determined Louisiana law does not apply to the account.

Considering the foregoing, under Arkansas law,[10] this Court may look to extrinsic evidence of Mary Scott's intent in placing Buck Scott's name on the Merrill Lynch account. Such inquiry is wholly inappropriate for summary judgment, as it will require the Court to make credibility determinations at trial. See *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (*en banc*) "in evaluating evidence to determine whether a factual dispute exists, 'credibility determinations are not part of the summary judgment analysis.'").

Considering the foregoing, this Court concludes the instant motions should be denied for failure of both parties to carry their burden to identify the law applicable to the nature of the asset itself, i.e., the account. Additionally, and alternatively, this Court concludes even if Arkansas law were to apply to the account at issue – which this Court presumes – summary judgment would be inappropriate at this juncture, as there are genuine issues of material fact with respect to the intentions of Mary Scott in including the name of Buck Scott as a joint tenant with rights of survivorship on the account itself.

Therefore, IT IS ORDERED that the Motion for Summary Judgment filed by defendant Brenda B. Orgeron [Doc. 19]; and the Motion for Summary Judgment filed by defendant Edward Crumley as the Executor for the Estate of Buck J. Scott [Doc. 20] are DENIED.

IT IS FURTHER ORDERED that this matter, in its current posture, is not ready for trial on the current trial date of January 4, 2010. Therefore, IT IS ORDERED that the trial date of January 4, 2010 and the pre-trial conference date of December 15, 2009 are UPSET.

---

[10] Again, this court notes the parties have cited to different sections of the Arkansas Code as governing the issue before the Court. To the extent Ms. Orgeron cites a statute or codal section that has been repealed, she fails to carry her burden of showing she is entitled to the relief requested. **The parties's supplemental briefs ordered herein shall cite to the proper Arkansas codal sections or statutes that govern the issues before the Court.**

IT IS FURTHER ORDERED that the parties shall brief the issue of which state's law applies to the nature of the asset at issue, that is, the Merrill Lynch account, as *an issue separate and apart from the issue of which **estate** should own the account.* After identifying what state's law applies to an account of this type, and to this account in particular, the parties shall brief the issue of which state's law – whether Arkansas, Louisiana, New York, or any other state, if another state is identified in the documentation provided by Merrill Lynch – governs the issue of ownership of the account, with particular attention paid to the fact that the account was opened and administered in Arkansas to two owners of the account who lived in Arkansas and received their account statement in Arkansas for a period of almost 18 years. This Court notes to the extent the parties cite to the Arkansas Code or any other Arkansas statute, **they shall cite to the proper codal article or statute governing the issues before the Court.**

The foregoing briefs – not to exceed 5 pages each, with normal margins and fonts – are due no later than December 31, 2009. Once the briefing has been received on this issue, the Court will set a telephone status conference to set the matter for trial, and, if necessary, set a new dispositive motion deadline.

THUS DONE AND SIGNED in Lafayette, Louisiana, this 30 day of November, 2009.

REBECCA F. DOHERTY
UNITED STATES DISTRICT JUDGE